# EXHIBIT 1

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| United States Department of Veterans Affairs<br>Office of General Counsel - Torts Law Group<br>810 Vermont Avenue, NW<br>Washington, DC 20420 | David Phillips<br>1307 N Washington Street<br>Wilkes-Barre, PA 18705<br><br>Michael T. Blazick, Esquire<br>Claimant's Attorney<br>1065 Highway 315, Suite 402<br>Wilkes-Barre, PA 18702 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| [X] MILITARY  [ ] CIVILIAN | (redacted) | Single | 04/11/2019  Thursday | Appx 12:00 - 4:00pm |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

David Phillips presented to the Wilkes-Barre VA Hospital on April 11, 2019 with an elevated white blood cell count and a history of laparoscopic sleeve gastrectomy 36 French Boughie on March 28, 2019. Mr. Phillips had also presented with chills and a general feeling of being unwell. The Veterans Administration Emergency Department and Surgical Department negligently treated Mr. Phillips by not properly ruling out and treating an anastomotic leak as described in more detail in the attached expert report of Kurt Roberts, M.D. Due to the size of the applicable medical records, they are included on a thumb drive.

9. PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

Not applicable.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

No property is at issue. This is a claim for bodily injury caused by medical negligence.

10. PERSONAL INJURY/WRONGFUL DEATH

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

The VA employees negligence and resulting delay in treatment permitted the leak and resulting infection to escalate. On April 20, 2019, Mr. Phillips had to be life-flighted to Geisinger Medical Center where he required gastric bypass, splenectomy, chest tube, feeding tube, IV antibiotics and an extended hospital and nursing home stay that lasted almost one year. Please see attached medical records, expert report and addendum for further detail.

11. WITNESSES

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| David Phillips | 1307 N Washington Street, Wilkes-Barre, PA 18705 |
| Kurt Roberts, M.D. | Department of Surgery, 40 Temple Street, Suite 7B, New Haven, CT 06510 |
| Medical Providers in Medical Records | See Attached Medical Records |

12. (See instructions on reverse). AMOUNT OF CLAIM (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| 0.00 | 4,500,000 |  | 4,500,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| /s/ | 570-931-6353 | 04/05/2021 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

### INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

**15.** Do you carry accident Insurance?  ☐ Yes    If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☐ No

No vehicle or property is at issue.  This is a medical negligence claim against the United States Department of Veterans Affairs.

**16.** Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?    ☐ Yes   ☐ No    **17.** If deductible, state amount.

Not applicable.  This is a medical negligence claim against the VA for bodily injury.

**18.** If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

Not applicable.

**19.** Do you carry public liability and property damage insurance?   ☐ Yes    If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☐ No

Not applicable.

### INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

**(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

### PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

### PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC  20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

<u>**ADDENDUM TO STANDARD FORM 95**</u>
<u>**DAVID PHILLIPS**</u>

I. <u>**SUPPLEMENTAL RESPONSE TO QUESTIONS 8 AND 10**</u>

On March 28, 2019, David Phillips underwent a laparoscopic sleeve gastrectomy with a 36 French Bougie performed by Ghazali Chaudry, M.D. at the Wilkes-Barre Veterans Administration Hospital ("Wilkes-Barre VA"). On April 8, Mr. Phillips had his blood drawn and it established an elevated white blood cell count of 14.4. This was an increase from 6.9 on April 1, 2019. The Wilkes-Barre VA's medical staff did not report this elevated WBC count to Dr. Chaudry or the surgical team on April 8, 2019. It was not until April 11, 2019 that the elevated WBC count was reported to Mr. Phillips.

On April 11, 2019, Mr. Phillips presented to the Wilkes-Barre VA's emergency department where he reported a history of chills and not feeling well. The standard of care for a patient who had recently had a laparoscopic sleeve gastrectomy who had multiple comorbidities that put him at a higher risk of a leak and who presented with an elevated WBC, history of chills and feeling unwell absolutely required the Wilkes-Barre VA's medical team to rule out an anastomotic leak – a life threatening complication of the laparoscopic sleeve gastrectomy. The standard of care required the medical team to approach the clinical presentation with a high degree of suspicion in light of an anastomotic leaks devastating consequences and due to the fact that early diagnosis and treatment is critical to a good outcome. The Wilkes-Barre VA's surgical team failed to order a CT scan of the abdomen which was mandated by the standard of care and simply gave Mr. Phillips an IV bolus and sent him home.

On April 20, 2019 - thirteen days after Mr. Phillips first exhibited signs of infection – Mr. Phillips presented to the Wilkes-Barre VA in a life threatening condition. Finally, the medical providers ordered a CT scan of the abdomen which established Mr. Phillips had a leak at the gastric sleeve site. Labs also established that Mr. Phillips now had a systemic infection/sepsis.

Thereafter, Mr. Phillips began his long and difficult journey to recovering from the leak and systemic infection. He required multiple and invasive procedures that included (1) emergent laparoscopic bypass and Roux-en-Y gastroenterostomy, (2) repair of a gastric fistula communicating with splenic abscess with extensive lesions that the surgeon described as requiring extra time, mental and physical effort, (3) laparoscopic splenectomy, (4) laparoscopic

gastrostomy with construction of gastric tube (STAMM); (5) Laparoscopic repair of esophagogastric junction fistula; (6) upper GI endoscopy with esophageal stent placement with fluoroscopy; and (7) placement of a chest tube. Mr. Phillips also required TPN, IV antibiotics and tube feedings for an extended period of time as documented in the medical records. He remained hospitalized and then in a nursing home until February 14, 2020. His G-tube was not removed until April 7, 2020.

As set forth in the accompanying report of Kurt Roberts, M.D. – a board certified surgeon who has performed approximately 1000 laparoscopic sleeve gastrectomy surgeries and is the Program Director of Yale University's Bariatric Fellowship – the Wilkes-Barre VA's medical team breached the standard of care when it failed to properly investigate and rule out an anastomotic leak on April 11, 2019 by ordering an CT of Mr. Phillips' abdomen. Dr. Roberts also opined that it was negligent and reckless to perform the surgery just before Dr. Chaudry was going to be deployed, leaving Mr. Phillips in a situation where the Wilkes-Barre VA did not have a bariatric surgeon available to attend and supervise Mr. Phillips post-operative care which resulted in the failure to properly investigate and rule out an anastomotic leak on April 11, 2019.

As a result of the Wilkes-Barre VA's negligence, Mr. Phillips did not receive appropriate care and treatment until April 20, 2019 – a delay of twelve days from the initial test results indicating an elevated WBC. This delay permitted the anastomotic leak and infection to escalate into a life threatening condition that resulted in devastating consequences for Mr. Phillips as detailed above and in Dr. Roberts' report.

In short, Mr. Phillips sought bariatric surgery to improve his life, mobility, and wellness. Mr. Phillips expected that he would be able to get back into the workforce one day. Instead, Mr. Phillips found himself being life-flighted via helicopter to Geisinger Medical Center where he did not know if he would survive. Mr. Phillips was forced to undergo multiple invasive procedures that Dr. Roberts opined would likely not have been necessary had the leak and infection been diagnosed on April 11, 2019. At age forty-nine, he also found himself confined to a hospital and nursing home for almost one year. The toll and deconditioning on his body is permanent and he faces long-term risks and consequences as set forth in Dr. Roberts' report.

Mr. Phillips is left with no spleen and is at increased risk for infections. He is unable to digest carbohydrates including, but not limited to, potatoes, pasta,

bread and rice. He is in significant pain on the left side of his naval for which he has been prescribed four Oxycotins per day and is consequently at risk of opioid dependence. He has painfully passed seventeen kidney stones since his surgery at Geisinger, which Dr. Roberts explained is a risk of the gastric bypass surgery necessitated by the delay in diagnosis. He has experienced abdominal cramping and was recently told by physicians at Geisinger that his abdominal pain is related to scarring and possibly due to the long-term use of a feeding tube.

In addition to the physical pain and suffering Mr. Phillips has endured, the mental anguish and depression he suffers cannot be understated. Mr. Phillips life has been a daily struggle since April 2019. He has been treating with VA mental health professionals about his depression and anxiety related to his medical care at the VA and his long and painful recovery. He is extremely depressed about the fact that he sought bariatric surgery to improve his life and productivity only to be worse off than before the surgery due to the delay in treating the leak. He struggles with feelings of anger, depression, guilt and hopelessness.

We have requested updated records and will provide them to you upon receipt. Mr. Phillips hopes that the VA recognizes its negligence and its impact upon his life and long-term well-being.

## II.   SUPPLEMENTAL RESPONSE TO QUESTION 11

In addition to the witnesses identified in the Form 95, the following will also testify as to Mr. Phillips damages:

Britt Yoder
1307 N Washington Street
Wilkes-Barre, PA 18705

Donald Kasper and Kristen Leonard
554 Main Road
Hunlock Creek, PA 18621

Karl Dymond
16 Butler Street
Wyoming, PA 18644

Sal Meli, Jr. and Heather Meli
240 West Shore Drive
Hawley, PA 18428

      Mr. Phillips reserves the right to produce expert reports with regard to vocation, loss of future earning capacity, and future medical expenses.

# Yale SCHOOL OF MEDICINE
## Department of Surgery

**Section of Gastrointestinal Surgery**
KURT E. ROBERTS, MD
*Associate Professor of Surgery*
*Minimally Invasive and Bariatric Surgery*
*Director of Natural Orifice Surgery*
*Program Director*
*Minimally Invasive Surgery Fellowship*

Temple Medical Building
40 Temple Street
Suite 7B
New Haven CT 06510
T 203 785-6060
F 203 785-6666
kurt.roberts@yale.edu
www.scarlesssurgery.yale.edu

April 1, 2021

Michael Blazick, Esquire
THE BLAZICK LAW FIRM
Cross Creek Pointe
1065 Highway 315
Suite 403
Wilkes-Barre, PA 18702

Re: David Phillips Medical Review

Dear Mr. Blazick:

Thank you for requesting my review of the medical care provided to David Phillips.

I am a general surgeon certified by the American Board of Surgery. I additionally completed a minimally invasive and bariatric surgery fellowship. I am currently an Associate Professor in the Department of Surgery at Yale University in New Haven, Connecticut. I am the Program Director of the Minimally Invasive Surgery and Bariatric Fellowship. As such, I have extensive training and experience in all aspects of the pre-operative assessment, intra-operative technique and post-operative management of bariatric patients. I am familiar with the standard of care applicable to laparoscopic sleeve gastrectomy as well as the post-operative and follow-up care involving this surgery. I have performed approximately 1000 laparoscopic sleeve gastrectomy surgeries and managed these patients' post-operative care.

At your request, I reviewed the following medical records concerning David Phillips:

- Wilkes-Barre Veterans Administration Hospital;
- Geisinger Medical Center – Danville;
- Geisinger Wyoming Valley Hospital; and
- Geisinger South Wilkes-Barre



1

I.  **SUMMARY OF MEDICAL CARE**

The following is a summary of Mr. Phillips' medical care. This is only a brief summary of Mr. Phillips long and difficult course of treatment that lasted almost a year until his discharge and is continuing.

On February 4, 2019, Mr. Phillips presented to the Wilkes-Barre Veterans Administration Hospital for a consultation regarding surgical weight loss options. Mr. Phillips sought this consultation due to his inability to control his weight, to improve his diabetes mellitus and to hopefully discontinue multiple medications. Afsana Sharmin, PA and Ghazali Chaudry, M.D. performed the evaluation. At this time, Mr. Phillips was forty-nine years old and weighed 332 pounds. His body mass index was 43.92 kg/m2. Mr. Phillips' comorbidities included hypertension, non-alcoholic steatohepatitis (NASH), diabetes mellitus, gastroesophageal reflux disease (GERD), Crohn's Disease, sleep apnea and multiple other co-morbid conditions. Dr. Chaudry and Ms. Sharmin determined that Mr. Phillips required further work up, and that a final decision would be made as to whether he was a candidate for bariatric surgery at a future date. It was documented that Dr. Chaudry was getting deployed sometime in April 2019, and that once the pre-surgery work up was completed the surgery would be scheduled in mid-March or after September 2019.

Thereafter, Mr. Phillips began his preoperative work-up. This work-up included an upper endoscopy, colonoscopy, consultation with the Wilkes-Barre VA's Weight Management Move Program, gastric emptying scan, gastroenterology consultation and surgical consents.

On February 25, 2019, Mr. Phillips returned to the VA's bariatric surgery team for reevaluation with Dr. Chaudry and Ms. Sharmin. At this time, Mr. Phillips' weight was recorded as 326 pounds and his BMI was 43.10 kg/m2. He had been participating in the Wilkes-Barre VA's Move Program. Mr. Phillips did not smoke, drink or use alcohol. At this time, the plan was for Mr. Phillips to complete his clearance for bariatric surgery by getting his medical risk stratification completed. Dr. Chaudry scheduled Mr. Phillips for a laparoscopic sleeve gastrectomy, possible open procedure on March 6, 2019.

On March 1, 2019, Ms. Sharmin documented a telephone encounter with Mr. Phillips. Ms. Sharmin explained that the surgery must be postponed because Mr. Phillips had a Remicade infusion to treat his Crohn's disease on February 20, 2019. The standard of care required the Remicade infusions to be discontinued for four weeks prior to surgery. The bariatric surgery was rescheduled for March 28, 2019.

On March 27, 2019, Mr. Phillips presented to Dr. Chaudry and Ms. Sharmin for his final pre-surgical evaluation. At this time, Mr. Phillips' weight was recorded as 293.6 pounds. Dr. Chaudry cleared Mr. Phillips for surgery.

On March 28, 2019, Dr. Chaudry performed a laparoscopic sleeve gastrectomy with a 36 French Bougie. A methylene blue and air insufflation confirmed that no leak was

2

present at that time. Based upon my review of the surgical note, Dr. Chaudry complied with the applicable standard of care and his surgical note reflects proper surgical technique. On March 29, 2019, an upper GI with KUB was performed to assess for a leak at the anastomotic site. The study was unremarkable and did not demonstrate a leak. Mr. Phillips remained at the Wilkes-Barre VA until April 1, 2019 at which time he was discharged to his home.

On April 2, 2019, Mr. Phillips presented to his primary care physician for follow-up. At this time, it was noted that he was on a clear liquid diet and having loose bowel movements, but not excessive in frequency. He denied pain at the surgical site, constipation, nausea, or vomiting. Mr. Phillips was directed to follow up with his surgical team.

On April 8, 2019, Mr. Phillips presented to Dr. Chaudry and Ms. Sharmin for his first post-surgical office visit. Overall, Mr. Phillips was doing well and tolerating his diet. Mr. Phillips was documented as passing flatus, moving his bowel, and voiding appropriately. His weight was measured at 279 pounds. His pulse was 97, Respiration 20, and BP 113/66. He denied abdominal pain, nausea/vomiting, fever or chills. Dr. Chaudry felt that Mr. Phillips was doing well. He had his blood drawn and awaiting the results. A follow-up appointment was scheduled on May 2, 2019.

On April 8, 2019, Mr. Phillips lab results showed that his white blood cell count was elevated at 14.4. This was an increase from 6.9 on April 1, 2019. On April 10, 2019, The Wilkes-Barre VA's infectious disease consult noted a "patient record flag." On April 11, 2019, the VA's Patient Aligned Care Team ("PACT") noted that the PACT team was notified about Mr. Phillips elevated white blood cell count by the nutritionist. It was documented that if Mr. Phillips did not have a fever, chills and was otherwise asymptomatic to repeat his labs on April 16, 2019 when he was in the VA for a GI consultation. If Mr. Phillips reported any symptoms, then Mr. Phillips was to report to the emergency department.

On April 11, 2019, three days after the lab results showed an elevated WBC, the Patient Aligned Care Team telephoned Mr. Phillips about his elevated white blood cell count. Mr. Phillips reported that he had been having chills for the past four days. He had not checked his temperature and reported that he was having diarrhea which he attributed to the surgery. Mr. Phillips was directed to report directly to the VA's emergency department.

On April 11, 2019, Mr. Phillips reported to the VA's emergency department. Mr. Phillips reported that he was doing well until four days ago when had chills and just didn't feel right. He felt that he had improved, but remained sensitive to cold and needed to dress more warmly than usual. The initial BP was 88/58 with a HR of 73. His WBC was 8.7. He received a 1 L bolus and his BP increased to 123/66.

A surgical consultation was ordered for post-operative leukocytosis. A surgical consultation report was completed by Ms. Sharmin and Rajeev Arora, M.D. Dr. Arora

3

appeared to be covering for Dr. Chaudry. The surgical consultation report noted that Mr. Phillips had presented to the emergency department due to post-op leukocytosis. The surgical consultation report notes that Mr. Phillips had experienced chills on Sunday night, but denied any documented fever. The surgical team's assessment was "post lap sleeve gastrectomy who had leukocytosis 14.4 on 4/8/19." The surgical team did not order any further work-up and simply directed Mr. Phillips to stay hydrated.

Upon discharge from the emergency department, Wilkes-Barre VA's emergency room physician's assessment and plan stated: (1) leukocytosis resolved – doubt anastomotic leak, post-op abscess or cellulitis; (2) dehydration improved – BP now back to normal will need to ensure oral hydration. Stable for discharge.

On April 12, 2019, Ms. Sharmin spoke with Mr. Philips over the phone. Ms. Sharmin documented the conversation as follows: "called and spoke to Phillips for follow up. He said doing well. Tolerating diet, working on his puree diet. Passing flatus. No issues with voiding or bowel movements. Denies nausea/vomiting, fever/chills. No new complaints. Recommended hydration with PO fluids and encouraged ambulation as tolerated."

On April 20, 2019, Mr. Phillips reported back to the VA's emergency department. At this time, Mr. Phillips complained of vomiting, abdominal discomfort, fever and chills over the past three days. He reported intermittent chills earlier on April 20, 2019 and a fever of 103 degrees. At triage, his temperature was 99 with pulse of 125. BP 120/67. A CT with contrast was performed of the abdomen. The CT showed an anastomotic leak/perforation along the posterior wall of the gastric sleeve surgical site. It appears that due to the lack of a bariatric surgeon's presence at the Wilkes-Barre VA, Mr. Phillips was taken emergently via life-flight to Geisinger Medical Center for surgical intervention and a sepsis workup to rule out free fluid in the abdomen.

Upon his arrival at Geisinger Wyoming Valley on April 21, 2019, Mr. Phillips received a bariatric surgery consultation with Mustapha Daouadi, M.D. Dr. Daouadi noted that the CT of Mr. Phillips abdomen showed a small leak at the gastric sleeve site. Mr. Phillips reported that Mr. Phillips felt feverish and like his heart was racing. Dr. Daouadi's impression was "49 year old male status post lap sleeve gastrectomy at the VA found to have a small leak from the sleeve site."

On April 21, 2019, a GI consultation was ordered and performed by Sandeep Khurana, M.D. and John Walker, D.O. for stent placement for gastric sleeve leak, pigtail drain placement. Their impression was: "leak after sleeve gastrectomy, sepsis. Leak after sleeve gastrectomy, possible abscess. Hemodynamically stable. Still febrile." Drs. Khurana and Walker recommended ABX and antifungals and a repeat CT with IV contrast to determine if the collection was walled off. If the collection did not have a definitive wall, then endoscopic/EUS drainage would not be possible.

4

On April 22, 2019, an EGD with stent placement was performed. The findings included:

> Evidence of sleeve gastrectomy was found in the gastric fundus. This was characterized by a disrupted staple line. Off to the left side, a small opening could be seen, through which pus was emanating. Presumably, this was communicating with the perisplenic/intrasplenic abscess. Under fluro guidance, a guidewire was inserted through the hold and contrast injected through a balloon catheter. This showed contained extravasation, but not a round cavity. A 7fr x 5 cm biliary double pigtail stent was placed with one end in this cavity and the other in the gastric lumen. Finally, the esophagus was stented with a 22 mm x 120 mm Hanaro covered stent under fluoroscopic guidance. Position was good, with the point of extrvasation covered by the stent.
>
> Impression: A sleeve gastrectomy was found, characterized by a disrupted staple line and communication to the peri/intrasplenic fistula. Two stents placed, one into the cavity and one in the esophagus covering the first stent.

On April 22, 2019, Christopher Still, DO performed a bariatric medicine consultation. Dr. Still noted that Mr. Phillips was transferred to Geisinger Medical Center due to a splenic abscess and concern of a gastric leak. A repeat CT scan with contrast showed a 2.5 x 5.6 x 4.3 splenic abscess in communication with gastric cardia along with left pleural effusion. Dr. Still recommended continuing Zosyn pending finalization of his cultures. Dr. Still believed that Mr. Phillips would likely require two to four weeks of IV antibiotics. On April 25, a PICC line was placed. On April 30, 2019, Mr. Phillips was discharged to his home.

On May 2, 2019, a social worker from the Wilkes-Barre VA noted that Mr. Phillips was suffering from depression. The social worker also noted that Mr. Phillips was an experienced medical corpsman and this has helped him to remain composed during this life threatening ordeal.

On May 10, 2019, Mr. Phillips presented to his primary care physician at the Wilkes-Barre VA for follow-up of anastomotic leak of stomach, splenic abscess and severe sepsis. Overall, he was doing well at this time.

On May 13, 2019, Mr. Phillips returned to Geisinger Medical Center for Bariatric Surgical Clinic follow-up. At this time, Mr. Phillips reported that he has really worsened and was experiencing terrible acid reflux. He started to vomit if he bent over quickly. He felt sick while lying flat. He has experienced occasional night sweats. A CT scan showed persistent anastomotic leak with unchanged abscess cavity.

On May 14, 2019, Mr. Phillips went to the Wilkes-Barre VA because he believed his PICC line might be blocked and his TPN was not flushing properly. Mr. Phillips reported nausea and chills.

On May 14, 2019, Mr. Phillips was directed to return to Geisinger Medical Center's emergency department. At this time, he was evaluated for abdominal pain and continued reflux. Mr. Phillips was admitted to the bariatric surgery's service.

On May 17, 2019, Mr. Phillips underwent an emergent laparoscopic gastric bypass and Roux-en-Y gastroenterostomy, repair of a gastric fistula communicating with splenic abscess with extensive adhesions requiring extra time, mental and physical effort, laparoscopic splenectomy, laparoscopic gastrostomy with construction of gastric tube (Stamm); Laparoscopic repair of esophagogastric junction fistula; upper GI endoscopy with esophageal stent placement with fluoroscopy. Each procedure was performed by David Parker, M.D.

Over the next several days, Mr. Phillips experienced a difficult recovery that included elevated WBC counts, ongoing nausea, vomiting and loose stools. His C differential test came back positive. He was forced to undergo chest tube placement to drain a pleural effusion.

By May 28, 2019, Mr. Phillips remained at Geisinger Medical Center. He continued with TPN, IV antibiotics, and tube feedings from 6:00 p.m. to 6 a.m. He continued to have a chest tube in place.

On May 29, 2019, Mr. Phillips was discharged from Geisinger Medical Center into the care of the Wilkes-Barre VA. Upon his arrival at the Wilkes-Barre VA, Joseph Carbo, M.D. evaluated Mr. Phillips for placement into the VA's service for IV antibiotics, tube feeding and monitoring of peritoneal drains. Dr. Carbo noted that Mr. Phillips had been on IV antibiotic (Zosyn) and IV antifungal (Diflucan) for the abdominal abscess and developed C-diff and is on IV Flagyl for this as well. He was previously on TPN but is now tolerating evening tube feeds.

On May 31, 2019, Ms. Sharmin saw Mr. Phillips for evaluation. At this time her assessment was as follows: "leaking postoperative laparoscopic sleeve gastrectomy status post laparoscopic Roux-N-Y, placement of esophageal stent, placement of gastrostomy tube and splenectomy. Splenic Abscess. Recent c-difficile infection." Ms. Sharmin's plan was to continue IV antibiotics, tube feeding and monitoring of peritoneal drains. Mr. Phillips was to continue Lovenox and Venodynes for DVT prophylaxis and continue Lansopraxole. She recommended continuation of physical therapy for reconditioning and leaving abdominal JP drains in place. She noted that Mr. Phillips platelets were elevated most likely due to the removal of his spleen.

On June 5, 2019, Mr. Phillips was discharged from the VA's surgical service into the VA's second floor SSU for continued IV antibiotics, tube feeds and physical and

occupational therapy/reconditioning. He remained on strict NPO and receiving his medications and tube feedings through his gastrostomy tube.

On June 10, 2019, Mr. Phillips returned to Dr. Parker for bariatric surgical follow-up. At this time, Mr. Phillips reported mild abdominal pain and difficulty tolerating tube feeds. Dr. Parker recommended continued tube feeds and to finish antibiotics later in June 2019. Dr. Parker also planned to pull back the left drain in two weeks. He also planned to remove the stents on July 18, 2019.

On June 10, 2019, Mr. Phillips underwent a malnutrition consultation. Mr. Phillips was found to have severe protein calorie malnutrition. Home tube feedings were directed to continue.

On July 1, 2019, Mr. Phillips was transferred to the Wilkes-Barre VA's short term nursing home for continued tube feeds, physical and occupational therapy and reconditioning. Mr. Phillips had a prolonged and difficult course of recovery and remained in the Wilkes-Barre VA's short term nursing home until February 14, 2020 when he was finally discharged to his home. On April 7, 2020, his G-tube was finally removed.

## II. OPINION

Mr. Philips sleeve gastrectomy was indicated and the surgery was performed within the standard of care on March 28, 2019. Dr, Chaudry appropriately utilized the Methylene blue and the air test during the surgery and no signs of a leak were seen. Additionally, the UGI series on March 29, 2019 did not demonstrate any evidence of a leak. Mr. Philips continued to recover and was discharged on postoperative day (POD) 4. On April 8, 2019, his WBC count was elevated up to 14.4k. Inexplicably, the elevated WBC count was not immediately reported to Mr. Phillips' surgical team on April 8, 2019. It was not until April 11, 2019 that these results were communicated to Mr. Phillips when he was directed to go to the emergency department. At this time, he reported that he had been experiencing chills and a general feeling of being unwell for four days. He stated that he continued to feel cold and had to dress more warmly than usual. Upon his presentation to the emergency department, he was initially hypotensive.

Given Mr. Phillips' comorbidities, which put him at an increased risk for leak, his 4-day history of chills, feeling unwell, elevated WBC count to 14.4k and being hypotensive on arrival combined with the fact that his symptoms started shortly after his sleeve gastrectomy, an anastomotic leak must have been at the top of the differential diagnosis. The standard of care required a high degree of suspicion given the serious and life threatening nature of anastomotic leaks. Moreover, time is of the essence in treating these leaks and the earlier the intervention, the better the outcome. The standard of care on April 11, 2019 absolutely required the surgical team to rule out a leak. This is typically done with a CT scan of the abdomen during a patient's stay in the emergency department.

Instead of approaching the patient with a high degree of suspicion, as required by the standard of care, the surgical team consisting of Ms. Sharmin and Dr. Arora seemed to focus on the external incisions and simply sent Mr. Phillips home to his own care. It was incumbent upon the surgical team to definitively rule out a leak by ordering a CT scan of the abdomen in light Mr. Phillips comorbidities, the presenting symptoms and the timing of the symptoms. A WBC count of 8.7 does not rule out an anastomotic leak. It was a breach of the standard of care to approach this clinical presentation in such a dismissive, and frankly cavalier attitude in light of the potentially devastating consequences of anastomotic leaks.

The emergency room physician's discharge note expressly states "doubt anastomotic leak, post-op abscess or cellulitis." The Wilkes-Barre VA's medical team clearly knew that there was a possibility of an anastomotic leak, but simply stated that they doubted it was a leak without a proper investigation to rule out this devastating and life-threatening complication. Instead, the VA's team simply sent Mr. Phillips home into his own care where the records make clear they knew he had little to no support system.

Moreover, the medical records suggest that Dr. Chaudry was unavailable and/or had been deployed by April 11, 2019. This left Mr. Phillips in a situation where he had no bariatric surgeon involved in his post-operative care during a critical time during which serious and life threatening complications are most likely to occur. It was a dangerous and reckless deviation from the standard of care to leave Mr. Phillips in a situation where a trained bariatric surgeon was not available for important post-operative follow-up care. It was a deviation from the standard of care not to have a trained bariatric surgeon available to provide a consultation on April 11, 2019 and/or to seek such a consultation.

Unfortunately, the failure to order imaging on April 11, 2019 to rule out a leak/abscess was woefully below the standard of care. This allowed the leak and abscess to continue and worsen.

It was not until POD 23 (April 20, 2019) when Mr. Phillips presented to the Wilkes-Barre VA emergency department with elevated temperature and tachycardia. This time a CT was performed which did show a leak and Mr. Phillips was now in a life threatening situation that required him to be life-flighted to Geisinger Medical Center to receive appropriate care due to the lack of an available surgeon at the VA. At this time, proper treatment was started. Drains, stents and subsequent surgeries were necessary as outlined in the very brief summary above.

The standard of care was clearly violated when the surgical team failed to recommend an imaging study such as a CT to rule out a leak/abscess during his emergency department visit on April 11, 2019. This failure to diagnose the leak/abscess allowed Mr. Phillips to deteriorate over the next nine days until he was finally diagnosed. This significant nine day delay in diagnosis and the failure to start treatment in a timely fashion allowed the leak to continue and the inflammatory process to escalate. This

8

delay increased the likelihood that Mr. Phillips would require extensive, invasive and prolonged treatments. If the leak would have been diagnosed during his visit on April 11, 2019, the less invasive treatment involving NPO, drains and stents would have likely been all that was needed to treat his life-threatening condition. All subsequent treatments including his gastric bypass, splenectomy, feeding tube and his extended hospital and nursing home stay would most likely not been necessary if Mr. Phillips received definitive and appropriate treatment of his leak on April 11, 2019.

Due to this delay the above mentioned additional treatments, Mr. Phillips has the following long term risks. His gastric bypass surgery is associated with several possible long-term complications such as a gastro jejunal ulcer that requires either an UGI or endoscopy for diagnosis and medications for treatment and sometimes a surgical revision. Additionally, these can develop into a perforation and require emergent surgical treatment. Also, he is at increased risk of postoperative adhesions which requires NGT placement, hospitalization and sometimes surgical intervention. He is also at risk of developing an internal hernia due to his gastric bypass anatomy which requires emergent surgical intervention as it is a life-threatening condition. Moreover, there is a high likelihood of required lifestyle changes due to the gastric bypass including the inability to tolerate carbohydrates. Patients after gastric bypass often develop a dumping syndrome that can include headaches, feeling unwell, abdominal cramps and massive diarrhea after ingesting carbohydrates. Given he also had a splenectomy he now is at increased risk for infections. He required vaccinations and will likely require regularly booster shots. One well-known life-threatening complication is the OPSI (Overwhelming Post-Splenectomy infection). Also, he is at risk of developing increased platelet count which increased the risk of blood clot formation. Also, given the need for the additional surgeries he is at long term risk of developing an abdominal wall hernia that may require surgical repair. Also, given his additional surgeries, he had additional scars that can negatively impact his self-image and can lead to long term abdominal pain. Also, he is at additional risk of developing kidney stones due to the gastric bypass.

Overall, given the need for long term stay due to his prolonged illness and overall deconditioning of his body, he is at risk of long term psychological and psychiatric complications and can result in a shortened life expectancy.

My opinions are based upon my education, training and experience as well as my review of the records that were available to me at this time. These opinions are expressed to a reasonable degree of medical certainty. I reserve the right to supplement and/or amend my opinions as additional information becomes available.

Sincerely,

Kurt Roberts, M.D.

9